UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )
            Plaintiff,         )      2:23-cr-00727-JJT
                               )
       vs.                     )      Phoenix, Arizona
                               )      November 17, 2023
Jorge Valdez,                  )          1:56 p.m.
                               )
            Defendant.         )
                               )
_____)

   BEFORE:   THE HONORABLE ALISON S. BACHUS, MAGISTRATE JUDGE


TRANSCRIPT OF PROCEEDINGS

DETENTION HEARING

APPEARANCES:

For the Government:
          U.S. Attorney's Office
          By:  Jacqueline Schesnol, Esq.
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

For the Defendant Jorge Valdez:
          Law Office of Brian F. Russo
          By: Brian F. Russo, Esq.
          10037 E. Dynamite Blvd., Ste. C101
          Scottsdale, AZ  85262

Transcriptionist:
Elva Cruz-Lauer
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003
(602) 322-7261

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

P R O C E E D I N G S

THE CLERK:  All rise.

THE COURT:  Thank you.  Please be seated.

THE CLERK:  Case number CR23-00727, United States of America versus Jorge Valdez, before the Court for a detention hearing.

MS. SCHESNOL:  Good afternoon, Your Honor.  Jacqueline Schesnol standing in for Benjamin Goldberg, representing the United States.

THE COURT:  Thank you, welcome.

MR. ROLLMAN:  Good afternoon, Your Honor.  Tony Rollman appearing for Jorge Valdez; however, I understand that new counsel has filed a notice of appearance and motion to substitute me.

If that is in fact their current position, at the appropriate time I would seek to be allowed to withdraw from representation, given that he has hired new counsel.

THE COURT:  All right.  Thank you.

MR. RUSSO:  Good afternoon, Your Honor.  Brian Russo standing by for order of the Court.

THE COURT:  All right.  Thank you.

The Court has reviewed Docket Number 26, which is a motion for withdrawal and substitution of counsel for Mr. Valdez, which indicates that Mr. Valdez has retained Mr. Russo to represent him in this matter.

Good cause appearing the motion for withdrawal and substitution is granted.

Mr. Rollman, you are withdrawn from this matter and excused from further responsibility and you may leave the courtroom at this time.

MR. ROLLMAN: Thank you very much, Your Honor.

THE COURT: And Mr. Russo, you are appointed, of course. The motion is granted.

MR. RUSSO: Thank you, Your Honor.

THE COURT: All right. Thank you. So we are here to discuss the issue of detention, and as we had discussed at our last hearing, the government has sought to reopen detention under 18 U.S.C. 3142(f), and we look forward to hearing from everyone here today.

In preparation for the hearing, the Court has reviewed, of course, the charging instrument, which is our indictment. We have reviewed the original bond report, Docket Number 8 from May 24th, the original conditions of release at Docket 11, Docket 20, which is the unopposed motion for hearing regarding release, and Docket 25, which again is that piece of the Pretrial Services addendum. So those are all of the documents that we have read in preparation for today.

The Court will be taking notes on its computer, so if you see me looking down at my screen, that's what I'm doing and also that's where I keep all of my documents, too -- most of

UNITED STATES DISTRICT COURT

them, so I will be looking there.

We want to clarify for the record on what basis the government is seeking detention of Mr. Valdez.

MS. SCHESNOL: Both flight risk as well as danger.

THE COURT: All right. And does either party believe this is a presumption case?

MS. SCHESNOL: No, Your Honor.

MR. RUSSO: No, Your Honor, I am sorry.

THE COURT: All right. Thank you.

How do you the parties plan on proceeding then, by proffer?

MS. SCHESNOL: Yes, Your Honor.

THE COURT: Okay. So Mr. Valdez, how this is going to work, is we will hear from the government first, and then we are going to hear from your lawyer, then we are going to hear from the government again, and that's because the government has the burden, so they get the last word.

All right. Let me go ahead and hear from you, Ms. Schesnol. Go ahead.

MS. SCHESNOL: Thank you, Your Honor. So Mr. Valdez was charged in Federal District Court for a firearms offense. He purchased an M249S belt-fed rifle for over $12,000 using a false address, and when researched, it turned out that false address was to a vacant house.

The defendant was allowed to be released, and while on

release, committed another firearms offense for which he was charged by the Maricopa County Attorney's Office.

It is my understanding that at a previous hearing there was information that I believe came from the defense attorney in the state case saying that he believed the state case, Maricopa County case, would be dismissed.

I personally communicated with the prosecutor from Maricopa County Attorney's Office yesterday, who advised that as of now, the County has no intention of dismissing that case, that they've never discussed dismissing that case, and was sort of baffled as to where the state defense attorney got that idea; maybe it was wishful thinking. But as of now, that case is moving forward in Maricopa County.

So the defendant, while on release for a federal firearms case, committed a state's firearm case and has been charged with armed robbery. So that's quite serious. And for those reasons, the government thinks the defendant is a danger.

The defendant is also a flight risk due to his ties to Mexico. I've reviewed in one of the Pretrial Services reports that the defendant's father lives in Mexico and the defendant has been there to visit his father, so he certainly has somewhere to go out of the country if he wanted to.

Mr. Russo was generous enough to share information with me that while it was believed the defendant had not checked in with his probation or Pretrial Services officer in

the state case, in the month of October, that perhaps that that was erroneous and that the defendant had in fact checked in on some online or portal system with which I am not familiar, and Mr. Russo was kind enough to share that information with me.

Nevertheless, the fact that the defendant committed a very serious crime while on release for a very serious crime, the government asserts that the defendant is a danger, as well as a flight risk for the ties to Mexico, and we are asking that he be detained pending his federal trial. Thank you.

THE COURT: Thank you. I just have a couple of follow-up questions. First, this Court is not aware of what happened with respect to the county. I mean, I can -- obviously we've read what's been provided to us by way of the documents that list the charges, which are very serious charges, to be sure. We just don't know what was the date of offense or alleged offense. I don't -- I'm not clear as to the facts and circumstances surrounding that that gives the government cause for concern. Do you have any more information on those questions?

MS. SCHESNOL: My understanding, Your Honor, if I can just have a moment.

THE COURT: Please.

MS. SCHESNOL: Is that the defendant in Goodyear, Arizona, I believe in September of this year, entered a business establishment and I believe he demanded money and sort

of padded his waistband, intimating that he had a weapon in his waistband, and then when he was arrested, he had at the very least a magazine on him. And --

MR. RUSSO: Judge, I am going to object. This completely misstates the police report. Those facts are completely inaccurate. That's fantasy. It's misleading to the Court, and I am going to object to it.

If she's not familiar with the facts, then don't guess, because his liberty is at stake.

THE COURT: Okay. Well, the parties have agreed to proceed by proffer, so she's permitted to say what she wants on proffer. And I am happy to hear what you have to say to correct what you believe is mischaracterization of the report.

And just so we're clear, could you let the Court know what it is -- what document that you are referring to, Counsel.

MS. SCHESNOL: Sure. I'm looking at a Goodyear Police Department police report.

THE COURT: All right.

MS. SCHESNOL: And I will also tell Your Honor that my information is also based on talking to Mr. Goldberg, the assigned AUSA, based on his review of these documents, as well as his communications with the County prosecutor.

THE COURT: And when did the alleged offense occur? You said September?

MS. SCHESNOL: September of this year.

THE COURT: And then when you say that the defendant was arrested and he had a magazine on him, was it the same day as the alleged incident? Was it moments from? Was it a week later? Was it --

MS. SCHESNOL: Your Honor, I apologize, I would need some more time to read through the police report to be able to answer that question. I will tell you that the -- it appears that the armed robbery took place on September 10th, 2023.

And as I go through the report, I would be able to better answer the date of arrest, but I -- from a quick glance, I do believe it was the same day.

THE COURT: All right. Take a moment and look please, and take your time because I just want to make sure -- that makes a difference with respect to that timeline.

MS. SCHESNOL: It was the same -- it was the same day that Mr. Valdez was arrested as the date of the alleged armed robbery. The armed robbery took place at a business, an ATT store.

It appears that the individual left in a white Subaru, which was then tracked to a home which is where I believe the defendant was found the same day.

And Mr. Goldberg, I think having believed this was going on a previous date, believed it was going to be a hearing, actually marked this police report as an exhibit, and there's copies for the Court as well as defense and -- along

with the exhibit list, so if Your Honor would like, I could certainly move to admit that exhibit.

THE COURT: Well, we are proceeding by proffer. If you want to move to admit something, you are welcome to do so. That's your choice. But if you believe the summary suffices, then we will hear from Mr. Russo. It is up to you.

MS. SCHESNOL: Your Honor, I -- not having more time to review this, I would move for the introduction of what the government had marked as Exhibit 3.

THE COURT: All right. Mr. Russo.

MR. RUSSO: Judge, I don't know what they marked as Exhibit 3. I haven't seen Exhibit 3. But I can refer her specifically to Bates 0019 and 0021, which indicate that at the time police had contact with my client, they patted him down and found no items of contraband.

So I have read the report. I know what's in the report. The government comes here asking for detention to restrict his liberty. They don't even know what's in the report. Clearly if we believe the police from that report, he had nothing on him.

THE COURT: Do you object to the admission of Exhibit Number 3?

MR. RUSSO: I do object to it, because I don't even know what they're introducing.

THE COURT: Great. Go ahead and show him what 3 is.

MS. SCHESNOL: As I stated, it's the Goodyear Police Department report.

THE COURT: Well, we need to get it marked as well. So you can come forward and provide it to the clerk.

MS. SCHESNOL: What I would say, Your Honor, is regardless, if the defendant had a magazine on him or not, the fact of the matter is that he has been charged by the State for a serious crime while he was on release for this case, both firearm-related offenses, and we do believe that he is a danger.

THE COURT: All right. Thank you. So it looked like you had given a copy of Exhibit 3 to Mr. Russo. Mr. Russo, now that you have had a chance to look at Exhibit 3, is there objection to admission of 3?

MR. RUSSO: I do have an objection, Your Honor. I have obtained the official report from Maricopa County, and from Mr. Valdez's current state court lawyer. It is Bates stamped -- the copy I received doesn't appear to have Bates stamps, so I don't know if it's the same copy or not. And there's no foundation as to what it is, where it come from, and who is saying it is what it is.

THE COURT: Well, the rules of evidence do not apply to detention hearing under federal law. Do you have any other objection?

MR. RUSSO: No, Your Honor.

THE COURT: 3 is admitted over objection.

(Exhibit Number 3 is admitted.)

THE COURT: All right. Anything else from the government before we hear from defense?

MS. SCHESNOL: No, Your Honor. Thank you.

THE COURT: Mr. Russo, whenever you are ready.

MR. RUSSO: Podium or the --

THE COURT: Whatever your preference is.

MR. RUSSO: Thank you, Your Honor.

Judge, first, as I mentioned, now that we have the report, what I have marked as Bates 009, which is part of the police report that you've been handed, the Glendale police officer said when he made contact with Mr. Valdez, he patted him down, searched him, handcuffed him and found no items of contraband.

The second officer who put him into the vehicle at Bates 0021 patted him down again and said there were no items of contraband. So the government made a big point to tell you, oh, he has a magazine, a firearm magazine, it is just not true.

But since the report has now been admitted, let's go through what's actually and really in that report.

On September 10th, 2023 -- let me first back up, Judge, I apologize.

So you were correct, Judge, statements of counsel about who is providing information, without dates, times,

places or details, do not meet the probable cause standard. That's United States versus Gotti, 634 F.Supp. 877 that was affirmed on appeal at 794 F.2d, 773 where the Court found that arguments of counsel is not sufficient to satisfy probable cause where there's a lack of detail sufficient to give the Court reason to believe that a crime has been committed and that Mr. Valdez committed the crime.

I want to make that the overarching theme that the Court consider when we move forward here.

Judge, on September 10th, 2023, an employee whose name is Jaime DeLaCruz, who worked for ATT, alleges that he called 911 to report that a black male wearing a hoodie and a mask to whom he could not see his face nor could he later identify him, had come into the store and, quote, unquote, with his left hand in the kangaroo pouch of the hoodie, but never threatened or stated that he had a gun or weapon.

Mr. DeLaCruz states that he never saw a weapon, he simply thought he probably had a weapon, quote, unquote.

Store employee did not know if the suspect fled on foot or in vehicle, could not describe him other than to say he was a 5 foot 11 black male.

Can you please stand up?

Let the record reflect that I am 5 foot 7. My client is the same height as me, and the Court can take notice that he is approximately the same height as me, and I will stand next

UNITED STATES DISTRICT COURT

to him if you would like. The point is he's not 5'11".

The employee from Jimmy John's also spoke with police. He said he saw a 6 foot 1 black male with hoodie and gray sweatpants exit the ATT with bags and enter a Toyota sedan.

Duke, who works at Walmart in the same parking lot, spoke with police and told him he saw 5 foot 11 black male with gray sweats exit the ATT store with two bags and enter a black Mustang. As I noted, Mr. Valdez is approximately 5 foot 7.

Police got information from the cell phones that were taken from the ATT store and pinged them and got them to a location. That location belonged to Ms. Rayes and her boyfriend Blaine Griffin, who is a black male who is 5 foot 11.

Your Honor, interestingly enough, Mr. Griffin was recently released from prison on Maricopa County case number CR2013-003463 for charges of burglary and manslaughter. Mr. Griffin was convicted of manslaughter arising from a robbery and a burglary.

Police called out for Mr. Valdez and Mr. Griffin and any other occupants of the house. Mr. Valdez came out of his own volition, talked to police. They handcuffed him, and as I told you, they patted him down and secured him.

The other two occupants did not initially come out for approximately an hour, where police surrounded the area, had them come out. Once they came out, they were initially detained and then released.

Mr. Griffin, who is the 5 foot 11 black male, who fits the description of all ATT employees and all other employees in the surrounding area, left and has never been caught again. Police have never talked to him again.

Interestingly enough, Your Honor, when police finally got a search warrant and went back to the residence, they spoke with Ms. Rayes. And during the search, they found a bag full of cell phones located in Ms. Rayes' vehicle.

I quote, "Later Rayes was asked about the phones that were located inside of her vehicle. It was confirmed that the vehicle was solely registered to her and no one else had driven the vehicle. When asked the last time she drove the vehicle or looked in the back seat, she said the day prior was the day she looked in the back seat and the phones were not there. When asked last time she drove the vehicle, Rayes stated, it was that day around 1550 hours, which she knew because she stated she took her boyfriend, Blaine Griffin, to the grocery store and they returned to the house. The robbery was alleged to have occurred at 1700. Her boyfriend remained at the home until police arrived. Copy of the search warrant was attached.

So here's the facts that we have. Mr. Valdez was at a house where phones were found in a vehicle belonging to Ms. Rayes and a man who fits the description of every witness, not Mr. Valdez.

So to say there's probable cause defies logic and the

UNITED STATES DISTRICT COURT

evidence as laid out in every part of that report that you are going to read.

Mr. Griffin has a conviction for homicide arising out of a burglary. He fits the description. It was his house and his girlfriend's car in which the phones were found. There is zero probable cause, Your Honor.

Would you like me to make my second part of my argument assuming if you do find probable cause or not according to 3148?

THE COURT: Sure. Whatever you would like to do. Sure.

MR. RUSSO: Judge, assuming that you -- if you do find probable cause, which I think based on those facts and your review of the report it would be very difficult to do that, but if you do, assuming arguendo, then second part of the question is, do you find that there are conditions or combinations of conditions that would mitigate the Court's concerns for his danger or his flight risk.

So first of all, Pretrial Services agrees that there are conditions that would mitigate that. But let me also point out to you, Your Honor, the state court set release conditions on the state court case.

The bondsman, Mr. Jose Valdez, is present today. He posted the bond. He has a personal relationship with Mr. Jorge Valdez. He is his cousin. The only reason I point that out is

because Mr. Jose Valdez personally put his name, his family's house, and his reputation with his company up for Mr. Jorge Valdez.

Mr. Jose Valdez has four children and a wife, all of whom rely on his job. He didn't do it lightly. He is here. He is willing to be voir dired by the Court and answer any questions you may have. But I think it's important that he showed up today. He's willing to tell the Court that he wouldn't do that lightly unless he knew that his cousin was going to show up for court and do everything the Court wanted him to do.

Your Honor, his sister Aline Ortiz Valdez is also present. She is married and has two kids and she has a home. She has recently taken out a loan on her home to refinance it to help assist her brother with his defense on his cases.

She does that, not because she cares about the facts, whether he is guilty or not, she knows he's presumed innocent, she does it because she knows he's going to show up. She knows he's going to defend his cases, and she wants him to have the resources to do that.

Your Honor, also Ms. Paola Huerta, H-U-E-R-T-A, is present. She is the girlfriend of Mr. Jorge Valdez. She lives with him. She and her two kids, they all live together, they have done so for about a year. She also would be -- has agreed that she would be a third party custodian. She works for a

doctor's office. She is present here today as well.

Finally, Judge, the government pointed out that Mr. Valdez has a family member in Mexico. He does, and he's actually been there before and he's visited his father there. He did it before when he knew he was charged by the government. He has never left the country because the judge told him not to.

He has the means to do that. When he got charged in state court and he was told by his lawyers, you could lose your liberty, you might not walk out of the courtroom, he still showed up. Because that's the man he is. He will do what he is supposed to do.

So, Judge, in summation, there's no probable cause. There is just simply not. When you read that report you will come to the same conclusion I did. Is it questionable because he was at the apartment where everything was found? Yeah, sure, right. But that not enough to say he committed a crime.

Even if you find that for some reason that he -- there is probable cause, I think we have addressed and rebutted any idea of detention sufficiently to show that he will show up and he will listen to what you have to say. Thank you, Your Honor.

THE COURT: All right. Thank you.

MS. SCHESNOL: Your Honor, just I apologize for not being thoroughly familiar with the police report. I did have the chance to review it during Mr. Russo's statements.

Just to help direct the Court, on page 17 of the report, there's a number in the lower left-hand corner. I don't have what I would call a Bates stamp, but it is a 76-page document, and in the lower left-hand corner it has the page number.

So on page 17, an individual whose last name I won't use in open court but whose first name is Saul, is the registered owner of a Subaru vehicle and he stated, Saul stated he loaned the car to his wife's cousin, Jorge, Jorge Valdez. Then on page 46 of the report it indicates that a magazine -- not a periodical, a magazine that goes into a firearm, was located in that Subaru. So just to help tie back in what I had said earlier about a magazine being found. It was found in the vehicle that Saul said he loaned to Mr. Valdez.

THE COURT: All right. Thank you.

All right. The Court has some reading to do. I have to read this exhibit that has been admitted, so we will take this matter under advisement and issue a ruling.

MS. SCHESNOL: I apologize, may I add one more thing?

THE COURT: Sure.

MS. SCHESNOL: I apologize. I neglected to mention that there has been a finding of probable cause. A grand jury did return an indictment against Mr. Valdez for the charges. Just to make that clear.

MR. RUSSO: Your Honor, as 3142 and 3148 say, this

Court is supposed to do an independent inquiry as to its own determination as to probable cause. Whatever has been done by a different jurisdiction has no weight for the hearing under 3142 and 3148.

THE COURT: All right. Thank you.

So I am just thinking through the logistics here. I need to read through everything that has been provided here today and then issue a ruling, and then of course we have initial appearances coming up here. So just a moment.

Thank you for your patience as I discussed just logistics with the clerk. So here's what we're going to do. We are going to stand at recess in this matter until 3:30. So that's about an hour from now, because we do have our initial appearance calendar at 3:00, but we don't have too many initial appearance hearings set. So my anticipation is that we will be concluded with those at about 3:30. But that will give the Court a chance to read through what it needs to read through and to write what it needs to write and then call its three o'clock calendar.

And if for some reason I need a little bit more time then I know that I will have it at the immediate conclusion of the initial appearances. I don't anticipate that happening though.

It's, I suppose, possible that I could be ready before 3:00, but I don't want to promise that because I just don't

UNITED STATES DISTRICT COURT

know how long it's going to take me, and then I have to read some things for my 3:00 calendar too.

So with that, we are going to go ahead and stand at recess, which means that we will need to be back here at 3:30.

Is there any issue with that that either side sees from the government?

MS. SCHESNOL:  I will be here, Your Honor.

THE COURT:  You will be here?  Okay.

MR. RUSSO:  Judge, I will have to make phone calls.  I am supposed to pick my daughter up 4:00 Pinnacle High School.

THE COURT:  Oh, that's way up there.

MR. RUSSO:  Yeah, it is, after volleyball practice, but I can see if I can make arrangements; otherwise, if you want to set a new date now knowing that, I don't want to make you rush through it.  I would like you to read the --

THE COURT:  Oh, I will read it.  I will read it.  I will read every single page of it.  What I was -- when I was leafing through it, I notice that a lot of it is -- there's just blank -- I mean, there's a lot of it that isn't substantive, so just looking through it and having read through literally thousands of similar kinds of documents, this isn't going to take me a terribly long amount of time.

But I do want to take the time to read each and every page of it.  But I am confident I can do that.  I have already started to get ready for my three o'clock calendar, so I don't

have a whole lot to do in that regard, and I am a pretty fast reader. So I believe I will be able to get it done, not too concerned about that.

But I appreciate you making an arrangement, but we will call it, and even if we -- you know, if we can get it done a little bit earlier, if initial appearances are done a little bit earlier than that, then we can call it earlier if you want to stick around. So we will call it just as soon as we can.

MR. RUSSO: Thank you, Your Honor.

THE COURT: But I don't want to overpromise.

MR. RUSSO: Thank you, Your Honor.

MS. SCHESNOL: Thank you.

THE COURT: We will stand at recess. Mr. Valdez, we will see you at 3:30.

THE DEFENDANT: Thank you, Your Honor.

(Recess taken at 2:28 p.m.; resumed at 4:13 p.m.)

THE CLERK: Case number 23-727, United States of America versus Jorge Valdez, before the Court for a detention hearing.

MS. SCHESNOL: Good afternoon again, Your Honor, Jacqueline Schesnol for Benjamin Goldberg representing the United States.

THE COURT: Thank you.

MR. RUSSO: Good afternoon, Your Honor. Brian Russo on behalf of Mr. Valdez. He is present.

THE COURT: All right. Thank you. All right. So the Court had obviously heard spirited argument from both sides and then we had stood at recess until 3:30, and obviously it's well past 3:30. Our initial appearance calendar didn't get started until a little bit later. I do apologize to keep everybody waiting.

Prior to coming back on the record here in this matter, the Court has had a chance to review the exhibit that the government had moved for admission and we had admitted.

The Court starts first with the statute that we are working under. As we had talked about the last time we were here, and set it for today's hearing, we had spent some time talking about the statutory scheme, the analysis that the Court was going to be doing here today.

And when we had initially released Mr. Valdez on May the 24th of 2023, we released him, and he wasn't subject to supervision by Pretrial Services. We had entered his release, and we had not set conditions on his release. The government wasn't asking for him to be detained. There were no conditions that were sought. We didn't impose conditions on him at that time. And so therefore the government filed a motion to revisit the issue of detention, and we made the record clear last time when we were here that the government wasn't moving for revocation under 3148 because there was no violation of conditions that had been alleged.

This is a very unusual matter where we didn't have a petition to revoke pretrial release. We didn't have a petition for action on pretrial release that we would typically get from Pretrial Services.

If someone is arrested on a state offense, we will typically see a petition. There was no petition. Because we didn't enter an order setting conditions of release where we had advised Mr. Valdez that you shall not commit any federal state or local crime. If we had done that, we would have seen a petition. That didn't happen. That's why we are in an unusual procedure posture here.

And so that is why we had a status hearing last time to talk about what statute are we discussing here. We clarified on the record that the government was seeking to reopen the issue of detention under 18 U.S.C. 3142(f). So the analysis is not under 3148, it is under 3142(f), and therefore, we look at the factors under 3142(g).

And so those factors, the first one is the nature and circumstances of the offense that is charged. Obviously we have a serious offense that has been charged in this particular matter with respect to firearm. The weight of the evidence is strong. This is the least important of the factors that the Court has to consider.

And of course these were the factors that the Court considered initially when we had ordered him released. But of

course 3142(f) allows the Court to consider information that it didn't have initially, and that is what the government has asked us to do.

So really the crux of the analysis that we're doing here today is, what's changed since May? What's the new thing that's changed? And that of course has been the contact that Mr. Valdez has had with local law enforcement since we released him on his own recognizance in May of this year.

So that is why the Court is really focused on the alleged offense conduct with respect to the state case. And obviously we've heard different versions from the lawyers about what occurred.

Defense counsel emphasized to the Court and had pointed the Court to a few different pages in this police report that again has been admitted as Exhibit 3, but just for the record there are no Exhibits 1 and 2 the Court has considered, it's just number 3.

So the Court has looked at this exhibit, and on page 12 of 76, the very first paragraph, on September 10th, 2023, at 1720 hours this officer was dispatched to a robbery in Goodyear. Call notes indicated Hispanic male subject described to be 5'7" tall, wearing face mask, et cetera, et cetera.

Later in that same report it talks about a Walmart security employee talking about an unknown race male 5'11" tall build, et cetera.

Then on page 14 of 76, this is where we get to the Game Stop employee who says, black or Hispanic male, average build, about 6'1".

Then we get to page 15 of 76 where we have the victim employee from the ATT store that was robbed. Suspect was described as a Hispanic or light-skinned black male, approximately 5'6" to 5'7", weighing approximately 160 pounds, and then it goes on with a description of what the individual was wearing.

So the Court typically wouldn't spend the time to go through in this much detail, but because this was something that was a point of great contention, I disagree that this report only talks about a very, very tall black male. It also talks about a 5'7" Hispanic male.

Mr. Russo made a point to tell the Court that he's 5'7" and his client is the same height as him. So the Court sees where this would be a potential physical match based on the victim in the underlying case, the state case, I mean.

We did note that on page 23 of 76, this is where the officers had approached Mr. Valdez. This was after the trackers on the phones that were stolen had become idle and were stationary right in front of this town home.

It indicates in the middle of page 23 of 76, that this officer and another officer arrived just moments after the trackers had stopped moving. They had a clear line of sight to

the front of the residence.

There was a garage door partially ajar.  They could see folks moving around inside of the garage area.  After a few moments and additional resources had been in place on the other side of the residence, verbal commands were given to Mr. Valdez to exit the garage.

The officer indicated that Mr. Valdez reacted to the commands by partially exiting the door, then quickly running back deeper into the garage out of view.  And then a few moments later he complied with the commands and ultimately was arrested.

In that vehicle was apparently the magazine.  We did read about that on pages -- well, it's throughout the entire report, but, for example, on page 18 of 76.

So the Court has reviewed this document here.  And highlighted some of the things that it had read.  There is more.  The Court disagrees with the defense's argument that it has to find that there is probable cause.  We are looking more at the 3142(g) factors.  But even if we had to find if there's probable cause, the Court does find there's enough here based on this document.

So even if this were a 3148(b) analysis, the Court does find that that standard would be met, but that's not the standard that the Court has to meet or that the government has to meet and the Court has to find.  I want to correct myself

there.

What the Court is finding is that this information obviously was not known to the government when the Court made its first determination of detention back in May because this conduct occurred in September of 2023.

Just give me one moment. Looking at my notes.

(Pause.)

THE COURT: The Court does recognize that Mr. Valdez has been on pretrial release through the county for the alleged offense conducted that we just discussed that was on September the 10th of 2023.

He has been compliant with his conditions of pretrial release over in the state.

We did note -- this isn't determinative, but I'm just making a note of things that I had read in the Pretrial Services addendum dated November 14th, 2023, that the defendant has been unable to find his passport so he hasn't surrendered it.

Again, this is not determinative. I'm just reviewing some of the things that the Court has read that we wanted to make a record of here today, but we are not finding that there's any sort of nefarious issue there whatsoever.

The Court has serious concerns based on what it has read in this report from the Goodyear Police Department that has been presented here today.

So we have considered that as part of the 3142(g) factors here that we have been outlining on the record.

Just a moment. Let me pull up my documents here in my computer as well.

(Pause.)

THE COURT: After carefully considering all of the information that has been presented to it here today, as well as all of the documents that we identified for the record earlier this afternoon, the Court does find that the government has met its burden and has shown by clear and convincing evidence that Mr. Valdez is a danger.

We also find by a preponderance of the evidence that he is a flight risk; therefore, sir, you will be ordered detained pending the next steps in this matter. We will issue a written order as well, but I did want to bring everybody in and make this record too.

Is there anything else that we need to take up here today from the government?

MS. SCHESNOL: No, Your Honor. Thank you.

THE COURT: From defense?

MR. RUSSO: Your Honor, just for the record, the Court did find that none of the factors, no other conditions or combination of those conditions could address the Court's concerns of flight or danger?

THE COURT: That's correct. Given what we have

outlined here today and the conduct that we have reviewed and read about that occurred in September of 2023 for which he is facing charges, that is our finding.

Anything further, Mr. Russo?

MR. RUSSO: No, Your Honor. Thank you, Your Honor.

THE COURT: We will be adjourned. We will show the marshals are present here to take Mr. Valdez into custody.

(Proceedings concluded at 4:27 p.m.)

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 6th day of December, 2023.

s/Elva Cruz-Lauer
Elva Cruz-Lauer

UNITED STATES DISTRICT COURT